# No. 26-11111

IN THE
**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

---

**777 PARTNERS LLC and INSURETY CAPITAL LLC,**
*Plaintiffs-Appellees,*

*v.*

**CHRISTOPHER J. PAGNANELLI,**
*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
JOSE E. MARTINEZ, DISTRICT JUDGE • CASE NO. 1:20-CV-20172-JEM

---

# APPELLANT'S OPENING BRIEF

---

**HORVITZ & LEVY LLP**
PEDER K. BATALDEN
ERIC S. BOORSTIN
3601 WEST OLIVE AVENUE, 8TH FLOOR
BURBANK, CALIFORNIA 91505-4681
(818) 995-0800

**BERGER SINGERMAN LLP**
LEONARD K. SAMUELS
201 EAST LAS OLAS BOULEVARD, SUITE 1500
FORT LAUDERDALE, FLORIDA 33301
(954) 525-9900-4439

ATTORNEYS FOR DEFENDANT-APPELLANT
**CHRISTOPHER J. PAGNANELLI**

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant Christopher J. Pagnanelli respectfully requests oral argument. This appeal presents an important and recurring question regarding the limits of proximate causation and damages flowing from the alleged wrongdoing. The opportunity for oral argument would allow counsel to answer the Court's questions and aid in the Court's decision-making.

# TABLE OF CONTENTS


Page

STATEMENT REGARDING ORAL ARGUMENT .................................ii

TABLE OF CONTENTS .....................................................................iii

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION.................................................................................. 1

JURISDICTIONAL STATEMENT ...................................................... 4

STATEMENT OF THE ISSUES........................................................... 5

STATEMENT OF THE CASE ............................................................. 6

A. 777 Partners owns Insurety Capital, which provides commission advance funding for insurance marketing organizations. .................................................................. 6

B. Joshua Wander recruits Christopher J. Pagnanelli to become Insurety's CEO. ........................................................ 9

C. Pagnanelli helps his business contacts acquire American Workers Insurance Services, a potential client for Insurety.............................................................. 10

D. Plaintiffs conduct due diligence and decide to fund AWIS. AWIS properly performs. ....................................... 13

E. Pagnanelli raises red flags regarding Insurety's failing to timely fund its clients. Wander accuses Pagnanelli of accepting "kickbacks" and terminates his employment. ................................................................... 16

F. Plaintiffs attempt to purchase an ownership stake in AWIS, then cripple AWIS by cutting off its funding during negotiations. ......................................................... 19

G. AWIS cannot continue operating and ceases repaying Insurety. Insurety sues AWIS in Texas. .............................22

H. AWIS declares bankruptcy. AWIS's owners create another insurance marketing organization, National Individual Insurance Agency. ............................................23

I. Insurety sues Pagnanelli. The district court rejects some of Plaintiffs' theories before trial. Insurety settles with AWIS. ............................................................25

J. The district court conducts a bench trial in this action and finds largely for Insurety. ...........................................27

K. The district court partially grants Pagnanelli's postjudgment motion to amend. Both sides appeal. ...........30

SUMMARY OF THE ARGUMENT .....................................................33

STANDARD OF REVIEW.....................................................................36

ARGUMENT .......................................................................................36

I. Under governing Florida law, a plaintiff suing for breach of contract must show the defendant was both the cause-in-fact and the proximate cause of its damages. ......................................36

II. The district court erred in concluding that Pagnanelli's contractual breaches caused Plaintiffs' damages. Plaintiffs caused their own harm. ................................................................42

A. Plaintiffs' unilateral decision to cut off AWIS's funding caused AWIS to stop repaying Plaintiffs. ............................42

B. Plaintiffs' damages were not caused by any breach of Pagnanelli's contractual loyalty obligations. ........................45

1. The district court's contrary conclusion rests on the finding that AWIS was not a viable business. ......45

2. The district court clearly erred in finding that AWIS was not a viable business. ................................46

C. Plaintiffs' damages were not caused by any breach of the contractual noncompetition or confidentiality provisions. .......... 52

1. The district court's contrary conclusion rests on the finding that Pagnanelli caused AWIS to file for bankruptcy instead of selling a stake to Insurety. .......... 52

2. Pagnanelli's involvement in AWIS and NIIA's efforts to secure funding was not a cause in fact of AWIS's bankruptcy. .......... 53

3. Any link between Pagnanelli's breach and AWIS's bankruptcy is too remote to satisfy the proximate causation standard. .......... 58

III. This Court should direct entry of judgment for Pagnanelli on the contract claim and remand for reconsideration of entitlement to attorneys' fees on the trade secrets claims. .......... 61

A. This Court should reverse the damages award and direct entry of judgment for Pagnanelli on the contract claim. .......... 61

B. This Court should vacate the finding of entitlement to fees on the trade secrets claims and remand for reconsideration. .......... 62

CONCLUSION .......... 65

CERTIFICATE OF COMPLIANCE .......... 66

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

**Aldon Indus., Inc. v. Don Myers & Assocs., Inc.*,
517 F.2d 188 (5th Cir. 1975) .......... 39, 40, 44, 45, 58, 60

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
432 F.Supp.2d 1319 (S.D. Fla. 2006) .......... 59

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985) .......... 46

*Andrews v. Emps.' Ret. Plan of First Ala. Bancshares, Inc.*,
938 F.2d 1245 (11th Cir. 1991) .......... 62

*Barati v. Aero Indus., Inc.*,
579 So.2d 176 (Fla. 5th DCA 1991) .......... 38, 40, 58

*Burger King Corp. v. Mason*,
710 F.2d 1480 (11th Cir. 1983) .......... 37

*Chipman v. Chonin*,
597 So.2d 363 (Fla. 3d DCA 1992) (per curiam) .......... 41

*Coley-Pearson v. Martin*,
156 F.4th 1133 (11th Cir. 2025) .......... 41

*Compulife Software Inc. v. Newman*,
959 F.3d 1288 (11th Cir. 2020) .......... 36

*Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*,
172 F.3d 781 (11th Cir. 1999) .......... 38

**Dep't of Transp. v. Anglin*,
502 So.2d 896 (Fla. 1987) .......... 38, 39, 40

*Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc.*,
459 So.2d 335 (Fla. 5th DCA 1984) .......... 39

*Exxon Co., U.S.A. v. Sofec, Inc.*,
517 U.S. 830 (1996) .......... 41

*Farman v. Deutsche Bank Nat'l Tr. Co.*,
311 So.3d 191 (Fla. 2nd DCA 2020) .......... 36, 61

*Fenner v. Gen. Motors Corp.*,
657 F.2d 647 (5th Cir. 1981) (per curiam) .......... 43

*Funny Cide Ventures, LLC v. Mia. Herald Publ'g Co.*,
955 So.2d 1241 (Fla. 4th DCA 2007) (per curiam) .......... 59

*Garcia-Celestino v. Ruiz Harvesting, Inc.*,
898 F.3d 1110 (11th Cir. 2018) .......... 36

*Gooding v. Univ. Hosp. Bldg., Inc.*,
445 So.2d 1015 (Fla. 1984) .......... 37

*Guinn v. AstraZeneca Pharms. LP*,
602 F.3d 1245 (11th Cir. 2010) .......... 37, 55

**Halliburton Co. v. E. Cement Corp.*,
672 So.2d 844 (Fla. 4th DCA 1996) .......... 37, 38, 59

*In re American Workers Insurance Services, Inc.*,
No. 19-44208-mxm11 (Bankr. N.D. Tex.) .......... 23

*In re Signal Nat'l LLC*,
No. 26-90190-elm11 (Bankr. N.D. Tex.) .......... 6

*Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*,
697 F.2d 928 (11th Cir. 1983) .......... 47

*Melton v. Estes*,
379 So.2d 961 (Fla. 1st DCA 1979) .......... 40

*MetLife Life & Annuity Co. of Conn. v. Akpele*,
886 F.3d 998 (11th Cir. 2018) .......... 62

*Miller Mech., Inc. v. Ruth*,
300 So.2d 11 (Fla. 1974) .......... 53

*Proto v. Graham*,
788 So.2d 393 (Fla. 5th DCA 2001) .......... 37, 58

**Proudfoot Consulting Co. v. Gordon*,
576 F.3d 1223 (11th Cir. 2009) .......... 37, 52, 53, 61

*Real-Time Lab'ys, Inc. v. Predator Sys., Inc.*,
757 So.2d 634 (Fla. 4th DCA 2000) .......... 63

*Resolution Tr. Corp. v. Stroock & Stroock & Lavan*,
853 F.Supp. 1422 (S.D. Fla. 1994) .......... 57

*Sanz v. R.T. Aerospace Corp.*,
650 So.2d 1057 (Fla. 3d DCA 1995) .......... 45

*Stensby v. Effjohn Oy Ab*,
806 So.2d 542 (Fla. 3d DCA 2001) .......... 36, 38, 57

*Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*,
904 F.3d 1197 (11th Cir. 2018) .......... 39, 46

*Tietig v. Se. Reg'l Constr. Corp.*,
557 So.2d 98 (Fla. 3d DCA 1990) .......... 37, 40

*United States v. Irey*,
612 F.3d 1160 (11th Cir. 2010) (en banc) .......... 42

*United States v. Robertson*,
493 F.3d 1322 (11th Cir. 2007) .......... 47

*XTec, Inc. v. Hembree Consulting Servs., Inc.*,
183 F.Supp.3d 1245 (S.D. Fla. 2016) .......... 63

**Statutes**

18 U.S.C. § 1030 .......... 26
18 U.S.C. § 1832 .......... 25
18 U.S.C. § 1836(b)(3)(D) .......... 62, 63

18 U.S.C. § 1836(c) .......... 4

28 U.S.C. § 1291 .......... 5
28 U.S.C. § 1331 .......... 4
28 U.S.C. § 1367(a) .......... 4

42 U.S.C. § 1983 .......... 41

Fla. Stat. § 605.0212(6) .......... 31
Fla. Stat. § 688.005 .......... 62, 63
Fla. Stat. §§ 688.001–688.009 .......... 25

**Rules**

Fed. R. App. P. 4(a)(1)(A) .......... 5

Fed. R. Civ. P. 12(b)(6) .......... 26
Fed. R. Civ. P. 26(a)(1)(A)(iii) .......... 27
Fed. R. Civ. P. 52(c) .......... 28
Fed. R. Civ. P. 52(b), 59(a), and 59(e) .......... 30

# APPELLANT'S OPENING BRIEF

## INTRODUCTION

Following a bench trial, Defendant Christopher J. Pagnanelli appeals an $8.1 million contract damages award to his former employers, Plaintiffs 777 Partners and Insurety Capital. Plaintiffs claim Pagnanelli breached his employment agreement in a way that caused Insurety's client AWIS to stop repaying the funds Plaintiffs lent. But their causation-of-damages theories are unsupported by the record or common sense. Because Plaintiffs did not show any harm *caused* by Pagnanelli, Pagnanelli is entitled to judgment on the breach of contract claim.

Insurance agents earn commissions when they sell policies, but they often receive those commissions later, when policyholders pay monthly premiums. Insurety's business model was to provide cash advances to middlemen—insurance marketing organizations (Insurety's clients)—so the middlemen could pay their agents' commissions without having to wait for the monthly premiums to be paid. Insurety's clients later repaid the advances plus hefty fees as premium dollars were received. The transaction was technically structured so Plaintiffs

"purchased" the agents' future commission streams, but practically speaking Plaintiffs were loaning money to their clients who were obligated to repay monthly.

Plaintiffs discovered Pagnanelli was given an undisclosed financial interest in one client, AWIS. Insurety terminated him. Then, although AWIS had timely repaid all its loans to Insurety, Plaintiffs demanded an equity stake in AWIS as a condition to continue funding and suddenly cut off AWIS's funding as a negotiating tactic. Starved of capital, AWIS collapsed into bankruptcy and stopped repaying Plaintiffs. Plaintiffs sued Pagnanelli for breaching loyalty, noncompetition, and confidentiality obligations in his employment agreement and blamed him for their AWIS losses at trial.

To link Pagnanelli's breaches to Insurety's claimed damages, the district court found AWIS wasn't a viable business and Insurety wasn't ever likely to be repaid. The undisputed record refutes both findings. AWIS operated for over two decades, satisfied Plaintiffs' rigorous due diligence, and never missed a payment while Insurety funded it. Plaintiffs themselves sought to buy a stake in AWIS because they perceived the relationship could be profitable. And even though

Plaintiffs drove AWIS to bankruptcy, it was *still* able to repay over ninety-two percent of the money it received from Plaintiffs. That is not a nonviable business.

The court's alternative theory—that months after Pagnanelli was fired, Pagnanelli "sabotaged" Plaintiffs' efforts to strongarm a stake in AWIS by helping AWIS and its owner's other company, NIIA, procure loans from an Insurety competitor—fares no better. Plaintiffs successfully stymied Pagnanelli's brief, post-termination stabs at helping to secure alternative funding for AWIS. And NIIA did not get funding from anyone until after AWIS filed for bankruptcy. Prompted by Plaintiffs, the district court speculated that Pagnanelli's involvement reduced Plaintiffs' negotiating leverage to take a stake in AWIS, ultimately leading Plaintiffs to pull AWIS's funding, in turn causing the bankruptcy that prevented AWIS from fully repaying Plaintiffs' loans. But Florida law rejects such attenuated causal chains. And the theory defies common sense: If Pagnanelli had succeeded in securing funding for AWIS, it would have continued operating and repaying Plaintiffs—eliminating the very damages the court awarded.

The district court accepted Plaintiffs' unsupported theories that, after Pagnanelli's termination, Pagnanelli somehow caused AWIS not to repay Plaintiffs' loans. But the district court overlooked the one theory supported by undisputed evidence: Plaintiffs' damages were self-inflicted. Their decision to suddenly withdraw funding destroyed AWIS and rendered it unable to repay Plaintiffs. Plaintiffs' executives made that decision months after Pagnanelli's termination and without his knowledge or involvement. It is an independent intervening cause severing any chain of proximate causation. This Court should therefore reverse the damages award, direct judgment for Pagnanelli on the breach of contract claim, and remand for reconsideration of an attorneys' fees finding on Plaintiffs' tagalong trade secrets claims that relied on the erroneous harm finding on their contract claim.

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over Plaintiffs' action because of their federal claim under 18 U.S.C. § 1836(c), *see also* 28 U.S.C. § 1331, and supplemental jurisdiction over their state claims, 28 U.S.C. § 1367(a).

The amended judgment was entered on March 5, 2026, and Pagnanelli timely appealed on April 3, 2026. (Docs. 351, 353; *see* Fed. R. App. P. 4(a)(1)(A).) This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. The district court ruled in favor of Plaintiffs on their claim that Pagnanelli breached his employment agreement. Pagnanelli does not contest the finding there was a breach. But did that breach proximately cause Plaintiffs' damages from nonpayment of their client's loans, where Plaintiffs' unilateral actions drove the client into bankruptcy and rendered the client unable to repay the loans?

2. Should the district court reconsider its award of attorneys' fees on the trade secrets claims that relied on its contract damages finding?

## STATEMENT OF THE CASE

### A. 777 Partners owns Insurety Capital, which provides commission advance funding for insurance marketing organizations.

777 Partners LLC is an investment company cofounded and co-owned by Joshua Wander, who also served as one of its two managing partners. (Doc. 16 at 2; Doc. 274 at 24–25.) 777 owned about sixty operating companies, including several lending businesses, insurance companies, airlines, media and entertainment businesses, and professional soccer teams.[1] (Doc. 274 at 24–25.) 777 had about 100 employees at the corporate level and about 1,000 employees across the whole organization. (Doc. 229, Ex. 11 (4/7/21 Beruff Dep. at 6).)

Insurety Capital LLC is one of 777's wholly-owned lending companies. (Doc. 350 at 2.) Insurety financed commissions on sales of medical insurance policies by providing cash advances to independent

---

[1] In October 2025, about three years after the trial in this action, the federal government indicted Wander for a nearly $500 million fraud arising from his financial misconduct at 777. (Doc. 325-1 at 2–18; *see* Doc. 333 at 1–2 (granting judicial notice of indictment).) The Securities and Exchange Commission also filed a civil complaint against Wander and 777 seeking disgorgement, penalties, and injunctive relief. (Doc. 325-3 at 2–30.) 777 is now in bankruptcy. *In re Signal Nat'l LLC*, No. 26-90190-elm11 (Bankr. N.D. Tex.).

marketing organizations, which are companies that market insurance policies. (Doc. 227 at 3; Doc. 274 at 25; Doc. 350 at 2.)

Independent marketing organizations serve as intermediaries between insurance carriers and independent insurance agents. (Doc. 350 at 2.) Insurance carriers underwrite insurance policies while the marketing organizations market, distribute, and sell those policies through agents who work for the marketing organizations. (Doc. 350 at 2.) Insurance agents earn a commission on each insurance policy they sell. (Doc. 350 at 2.) Ordinarily, that commission is not received until policyholders pay their monthly policy premiums. (Doc. 350 at 2.)

Insurety offered marketing organizations the ability to satisfy and retain their insurance agents by advancing several months of future commissions earned by the insurance agents. (Doc. 350 at 2.) In exchange for the advance, Insurety acquired the rights to the agent's future commission payments earned from the previously-sold policies, plus an administrative fee known as the per-member per-month fee, or "PMPM." (Doc. 350 at 2–3; *see* Doc. 55-1 at 1.) Insurety also required the marketing organization to guarantee the repayment and fees for the money it advanced. (Doc. 55-1 at 1–2; Doc. 200 at 1147 (Addendum to

Proof of Claim of Insurety Capital at 3); Doc. 285-4 at 21; Doc. 350 at 13.)

This transaction had features of a loan and could be described colloquially as money "lent" to a "borrower" who was essentially charged "interest." (Doc. 271 at 123; Doc. 272 at 90; Doc. 273 at 44, 103.) But Insurety did not characterize the transaction as a loan—in part to avoid usury laws. (Doc. 280-10 at 15 (Insurety presentation to its lender: "Documents detail that it is a sale, not a loan"; "If the transaction is recharacterized as a loan, some state usury laws may be implicated").) Especially for the insurance policies that long remained in effect after the advance was paid off, Insurety stood to profit from purchasing the right to future commission payments and charging a PMPM fee well in excess of the interest available from a standard loan. (Doc. 229, Ex. 11 (4/7/21 Beruff Dep. at 96); *see* Doc. 280-10 at 15; Doc. 283-7 at 6; Doc. 286-7 at 1.) The technical characterization of this transaction is irrelevant for the appeal. For clarity we will use the term "loan" in the colloquial sense to describe the money Insurety paid clients to buy their right to the future revenue stream of commission payments.

### B. Joshua Wander recruits Christopher J. Pagnanelli to become Insurety's CEO.

In 2017, Pagnanelli had been working for about a year and a half at Producer Advance, an insurance commission finance company. (Doc. 272 at 4, 8; Doc. 274 at 112.) Pagnanelli was introduced to Wander and they discussed the insurance commission financing business. (Doc. 229, Ex. 10 (5/3/21 Wander Dep. at 11).) Not long after, Wander asked Pagnanelli to become the CEO of Insurety, his newly-formed competitor to Producer Advance. (Doc. 229, Ex. 10 (5/3/21 Wander Dep. at 10–14, 54).) Pagnanelli was thirty-three years old at the time. (Doc. 274 at 131.)

Pagnanelli signed an employment agreement with 777 and Insurety. (Doc. 350 at 3.) Plaintiffs were obligated to pay him a base salary of $225,000, a signing bonus, and possibly an annual bonus. (Doc. 146-1 at 2; Doc. 350 at 3.) Separately, Plaintiffs offered Pagnanelli twenty percent equity in Insurety, but did not follow through with that offer. (Doc. 50-1 at 2; Doc. 229, Ex. 10 (5/3/21 Wander Dep. at 22); Doc. 274 at 112–113; Doc. 280-10 at 38.)

Pagnanelli signed the employment agreement and thereby agreed to comply with Plaintiffs' employee policies regarding actual or

apparent conflicts of interest. (Doc. 146-1 at 8; Doc. 350 at 4.) Those policies included not taking part in or attempting to influence Plaintiffs' business dealings with a company in which Pagnanelli had a financial interest, and also disclosing any such interest. (Doc. 146-2 at 3; Doc. 350 at 4–5.)

Pagnanelli also agreed that, for one year following the termination of his employment, he would not compete with Plaintiffs. (Doc. 146-1 at 5–7; Doc. 350 at 7–8.) And Pagnanelli agreed not to disclose Plaintiffs' confidential information. (Doc. 146-1 at 3–4; Doc. 350 at 6–7.)

### C. Pagnanelli helps his business contacts acquire American Workers Insurance Services, a potential client for Insurety.

In January 2018, Pagnanelli started as Insurety's CEO. (Doc. 350 at 3.) Pagnanelli's main responsibility was sourcing new clients—the independent marketing organizations that had stables of insurance agents. (Doc. 272 at 82.) Insurety had no clients but those Pagnanelli brought to Insurety. (Doc. 272 at 82; Doc. 274 at 113.) The first client Pagnanelli brought to Insurety was Agentra Healthcare. (Doc. 274 at 114.)

Pagnanelli reported to Jorge Beruff. (*See* Doc. 273 at 54.) Beruff worked for 777, leading its insurance investments. (Doc. 272 at 78.) Beruff was a board member of Insurety, as well as the principal on 777's investment team overseeing Insurety. (Doc. 272 at 80.)

Landon Jordan was a well-known figure in the insurance industry whom Pagnanelli knew from his prior work at Producer Advance. (Doc. 274 at 113.) Jordan called Pagnanelli out of the blue to ask for financing leads to fund Jordan's purchase of American Workers Insurance Services, Inc. ("AWIS") (an independent marketing organization) and Association Healthcare Management, Inc. ("AHCM") a third party administrator.[2] (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 35); Doc. 274 at 113; Doc. 350 at 12.)

AWIS had been operating for over two decades. (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 51).) Jordan wanted to manage AWIS, but did not have the money to buy the company. (Doc. 229, Ex. 5 (6/8/21 Lindsey Dep. at 19–20).)

---

[2] A "third party administrator" handles administrative functions for insurers, such as collecting and distributing policy premiums. (Doc. 80-11 at 2.)

Pagnanelli contacted Beruff, hoping that 777 would fund Jordan's transaction. (Doc. 274 at 114.) Beruff declined. (Doc. 274 at 114–15.)

Pagnanelli believed that if he helped Jordan find funding, it could help Insurety gain a second client. (Doc. 274 at 115.) Around May or June of 2018, Pagnanelli introduced Jordan to David Lindsey—the principal of Insurety's only client at the time, Agentra—and raised the issue with Lindsey just as he had to Beruff. (Doc. 227 at 4; Doc. 274 at 114.) Shortly after, Lindsey acquired AWIS and AHCM, which Jordan ran. (Doc. 227 at 4; Doc. 229, Ex. 5 (6/8/21 Lindsey Dep. at 21); Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 43); Doc. 274 at 115–16; Doc. 350 at 12.) Lindsey paid between $3.5 and $5 million for the companies. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 66–67).)

In return for brokering the introduction, Pagnanelli received a referral fee in the form of a percentage of AWIS's fees for the insurance policies it sold. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 57); Doc. 350 at 12.) Pagnanelli was also offered an ownership interest in AWIS through a separate holding company, though he declined the offer within a day because he thought it was a conflict of interest. (Doc. 229,

Ex. 8 (5/21/21 Jordan Dep. at 126–27); Doc. 271 at 68–70; Doc. 350 at 12.)

### D. Plaintiffs conduct due diligence and decide to fund AWIS. AWIS properly performs.

In June or July 2018, Pagnanelli introduced AWIS to Insurety's management as a potential client for Insurety. (Doc. 203-5 at 3; Doc. 350 at 13.) AWIS needed commission funding to run its business. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 130).)

Before approving AWIS as a client, Insurety subjected the deal to a robust ten-step deal approval process designed by Beruff and used across 777's other businesses. (Doc. 272 at 71–72; Doc. 273 at 45–46; Doc. 288-4 at 3–4.) The process required Robert Gray (Insurety's then-general counsel), Beruff, and a 777 financial analyst to review every new opportunity overview package. (Doc. 203-5 at 3; Doc. 273 at 47, 50.) Beruff had the right to veto any deal. (Doc. 273 at 46.)

The rigorous legal and financial vetting process included background checks on all key managers of the prospective client, review for prior or pending litigation, examination of financial statements, and agreement to all transactional documentations. (Doc. 280-6 at 12

(Insurety Due Diligence Review).) The "know your customer" investigation included on-site visits with the target client and its management team and an analysis of the products it sold. (Doc. 273 at 45.) 777 provided the extensive due diligence infrastructure so that the operating executives of a new business like Insurety could focus on business development and winning new business. (Doc. 273 at 46.)

The due diligence process culminated with Gray delivering a full diligence closing folder and underwriting model to Beruff for his approval. (Doc. 273 at 52.) Beruff then needed 777's outside lender—here, Leadenhall Capital Partners—to approve the transaction.[3] (Doc. 273 at 52.)

AWIS satisfied Plaintiffs' ten-step approval process without generating any significant concerns. (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 38, 43).)

---

[3] Wander and 777's alleged $350 million in fraudulent misrepresentations to Leadenhall (not about AWIS) are a large component of the federal fraud indictment and SEC complaint discussed above (*see* Doc. 325-1 at 2–18; Doc. 325-3 at 2–30), along with a civil action brought by Leadenhall against Wander and 777 (*see* Doc. 314 at 2). Pagnanelli testified that his discovery of the financial impropriety by Wander and 777 was the catalyst for Plaintiffs' filing this lawsuit. (*See* Doc. 274 at 128.)

According to Plaintiffs, Pagnanelli did not disclose the extent of his relationship with AWIS, and if he had, Plaintiffs would not have approved the transaction. (Doc. 272 at 90; Doc. 273 at 71–73; Doc. 350 at 13–14.)

Insurety ultimately entered into three related agreements in which it agreed to advance money to AWIS in exchange for the assignment and repayment of AWIS's future receivables and the payment of fees. (Doc. 350 at 2–3, 13.)

In August 2018, Insurety started funding AWIS's commissions. (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 66).) AWIS's weekly funding requests had to be individually approved by 777's CFO and controller. (Doc. 274 at 94–95.) Insurety retained discretion to reduce the number of months of commissions advanced to AWIS, or to stop advancing funds altogether. (Doc. 273 at 56–57; Doc. 274 at 122–23.)

Throughout 2018, Insurety lent about $9.7 million and AWIS repaid about $1.7 million. (Doc. 200 at 1261 (777's response to Interrogatory No. 2).) AWIS was never delinquent on a payment, and Plaintiffs had no issues with AWIS. (Doc. 272 at 87; Doc. 273 at 105, 107; Doc. 274 at 98.)

### E. Pagnanelli raises red flags regarding Insurety's failing to timely fund its clients. Wander accuses Pagnanelli of accepting "kickbacks" and terminates his employment.

In early 2019, 777 and Insurety started having liquidity problems. (Doc. 274 at 93, 126.) Insurety's clients complained to Pagnanelli about not getting the funding Insurety was supposed to provide. (Doc. 274 at 126; *see* Doc. 273 at 55 (Beruff: "On occasion, we would be late").) Insurety's AVP of finance, Alexander Hartelust, saw that Insurety regularly lacked the funds to meet its clients' funding requests, and that the clients were frustrated. (Doc. 274 at 93–94.) AWIS was one of the clients that Insurety was not timely funding. (Doc. 274 at 99.) Pagnanelli was frustrated because Insurety's lack of available money made him unable to serve Insurety's clients. (Doc. 274 at 128.)

Pagnanelli first raised the clients' concerns with 777's finance team, including 777's CFO Damien Alfalla.[4] (Doc. 274 at 126–27.) Pagnanelli visited Alfalla's office and complained that Insurety could not timely fund its clients. (Doc. 274 at 127.) Recognizing that Insurety

---

[4] Alfalla has since pleaded guilty to federal fraud charges relating to his handling of 777's funds. (See *supra* footnotes 1, 3; Doc. 325-2 at 2–11; Doc. 346-1 at 6.)

did not have the money it should have, Alfalla confirmed Pagnanelli's suspicion that 777 was redirecting Insurety's money to fund other ventures, including an airline (Flair) that was having financial problems. (Doc. 271 at 132–33; Doc. 274 at 127–28.) But Alfalla talked a good game, saying 777 was "going to make up for it, we're going to get the money." (Doc. 274 at 127.)

Around February 2019, 777's primary lender, Leadenhall, was also upset that Insurety's money was going to other companies and shut off the 777 money earmarked for Insurety for a few weeks. (*See* Doc. 271 at 136; Doc. 287-7 at 7 (NP0000000000042).)

As Pagnanelli started raising red flags about the improper redirection of Insurety's money, his relationship with Plaintiffs started to deteriorate. (Doc. 274 at 128; *see* Doc. 273 at 55 (Beruff: "I do recall, yeah, perhaps an allegation of him bringing something like that up, yes").) In March 2019, Pagnanelli raised his concerns directly with Wander in a meeting. (Doc. 271 at 90; Doc. 274 at 129–30.) They disagreed and ended the meeting on bad terms. (*See* Doc. 271 at 90; Doc. 274 at 129–30.)

The next month on April 4, 2019, Pagnanelli met with Wander again. (Doc. 271 at 88.) This time, Wander accused Pagnanelli of accepting "kickbacks" from AWIS.[5] (Doc. 271 at 90.) Plaintiffs suspended Pagnanelli pending further investigation. (Doc. 350 at 3.) Wander did not fire Pagnanelli, but instead asked Pagnanelli to accept a demotion from CEO to a sales role. (Doc. 271 at 94–95, 101, 132.) Pagnanelli refused the demotion. (Doc. 273 at 83.)

On April 24, 2019, Plaintiffs terminated Pagnanelli's employment, effective April 4, 2019. (Doc. 350 at 11.) Gray became Insurety's CEO. (Doc. 273 at 70.) AWIS remained current in repaying its loans from Insurety. (Doc. 273 at 105.)

---

[5] How Wander and Plaintiffs came to believe this is unclear. Pagnanelli testified that this meeting was the first time Wander recharacterized board payments Pagnanelli had previously disclosed to plaintiffs as "kickbacks." (Doc. 271 at 90.) Insurety claimed without elaboration that it "received information" about contractual breaches "in the first two weeks of March, 2019" as part of an "unrelated investigation." (Doc. 279-7 at 2.) No evidence about this "investigation" was elicited at trial. The district court did not make a finding on the issue. (*See* Doc. 350 at 15.)

### F. Plaintiffs attempt to purchase an ownership stake in AWIS, then cripple AWIS by cutting off its funding during negotiations.

In Spring 2019, around the time of Pagnanelli's suspension and termination, Jordan purchased sole ownership of AWIS and AHCM from Lindsey. (Doc. 227 at 4; Doc. 273 at 88.) Jordan paid Lindsey roughly what Lindsey had paid for the companies—approximately $3.5 million to $5 million. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 66–67).) Lindsey made a profit on the transactions, however, because Lindsey received around $2 million from the companies during his ownership. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 73–74).)

After Plaintiffs accused Pagnanelli of accepting "kickbacks," and after Pagnanelli's termination, Plaintiffs attempted to negotiate a new relationship with AWIS. (Doc. 350 at 15; Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 153–54).) Up until then, Plaintiffs had not had issues with AWIS and AWIS was still timely meeting its repayment obligations. (Doc. 272 at 87; Doc. 273 at 58, 105, 107; Doc. 274 at 97–98.)

Plaintiffs sought more control over AWIS's cash flows as a condition of continued funding. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at

156); Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 75); Doc. 273 at 58.) More specifically, Plaintiffs demanded an ownership interest in AWIS. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 156); Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 76); Doc. 273 at 57–58, 64–65.) Plaintiffs described this as an attempt to "right size" Plaintiffs' risk (Doc. 273 at 88; Doc. 350 at 15), or alternatively, to "right-size the relationship" with AWIS (Doc. 273 at 57). (*See* Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 76); Doc. 273 at 89–90, 109.) Plaintiffs thought "it could be a very profitable relationship." (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 77).)

Plaintiffs gave Jordan an ultimatum: To keep funding AWIS, they needed some control over AWIS through an ownership stake. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 156).) Plaintiffs discussed acquiring a thirty percent stake. (Doc. 80-11 at 3; Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 155); Doc. 271-1 at 130–31.)

Initially, Jordan was not opposed to selling a stake in AWIS because he wanted to preserve AWIS's funding relationship with Insurety, and because he thought it might help him take the company public in the future. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 157); Doc. 271-1 at 131 (5/20/21 Brock Dep. at 131).) The parties agreed on a

broad term sheet for the transaction and continued to negotiate the details. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 157–59); Doc. 273 at 109.)

But in July 2019, months after Pagnanelli left Insurety's employ and while AWIS was still meeting its repayment obligations, Insurety suddenly stopped funding AWIS. (Doc. 80-11 at 3; Doc. 272 at 87–88; Doc. 273 at 94, 104–105, 107, 110; Doc. 274 at 98.) Insurety gave Jordan no warning or explanation. (Doc. 80-11 at 3; Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 213).) Insurety simply told Jordan it would not resume funding unless they finalized the restructuring agreement. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 159); *see* Doc. 273 at 64–65.)

Internally, Plaintiffs told Insurety's AVP of finance that the reason Plaintiffs stopped funding AWIS was because Plaintiffs themselves lacked the funds. (Doc. 274 at 99–100.) This was consistent with Jordan's prior experiences where Insurety said money had been sent but AWIS would not receive it. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 207).) It was consistent with Pagnanelli's earlier complaints about funding issues. (Doc. 271 at 132–133; Doc. 274 at 126–128.) And it was consistent with Jordan's observation that Insurety had also

stopped advancing funds to other companies in the business around the same time it stopped funding AWIS. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 213).)

### G. AWIS cannot continue operating and ceases repaying Insurety. Insurety sues AWIS in Texas.

Insurety's withdrawal of funding destroyed AWIS's ability to operate. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 213–14); Doc. 229, Ex. 9 (5/20/21 Brock Dep. at 220).) AWIS needed commission funding to run its business. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 130); Doc. 274 at 100.) Having lost its funding, AWIS soon ran out of capital. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 159).)

Unemployed for months, Pagnanelli made two phone calls and sent a few emails for Jordan during Jordan's search for a new funding source for AWIS. (Doc. 272 at 14–15, 24 (around May 2019, one short call with his former boss at Producer Advance); *see* Doc. 272 at 32–35, 47 (in late July 2019, emails and a cold call to someone he had never met).) Those efforts went nowhere. (Doc. 272 at 27, 67.) Insurety successfully blocked AWIS's alternative funding attempts by

withholding its consent and filing UCC liens. (Doc. 80-1 at 4; Doc. 272 at 17, 60–61.)

It was only when AWIS ran out of capital after losing Insurety's funding that AWIS stopped repaying Insurety's existing loans. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 159–60); Doc. 272 at 88; Doc. 273 at 59, 107.)

Insurety then sued AWIS for non-payment in Texas. (Doc. 55-1 at 2; Doc. 273 at 91.) AWIS counterclaimed against Insurety. (*See* Doc. 297-1 at 1.)

Insurety obtained a temporary restraining order that required AWIS to pay Insurety and prohibited AWIS from obtaining another advance funding partner. (Doc. 55-3 at 2–3; Doc. 55-4 at 1; Doc. 273 at 91.) After AWIS still did not pay, Insurety filed two motions for contempt. (Doc. 273 at 91–92.)

### H. AWIS declares bankruptcy. AWIS's owners create another insurance marketing organization, National Individual Insurance Agency.

In October 2019, approximately six months after Pagnanelli's termination, on the eve of the second contempt hearing in the Texas litigation, AWIS filed for bankruptcy. (Doc. 55-8 at 4; Doc. 273 at 92; *In*

*re American Workers Insurance Services, Inc.*, No. 19-44208-mxm11 (Bankr. N.D. Tex.).)

Around the same time, Jordan acquired a non-operating LLC named National Individual Insurance Agency, LLC ("NIIA") as a vehicle for him to continue operating in the insurance marketplace.[6] (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 18–19, 142, 172).) NIIA was a shell corporation that Jordan purchased because it was already licensed to market insurance in various states. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 142, 172–73).) NIIA and AWIS were not interchangeable; NIIA mostly marketed different insurance products from AWIS. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 142, 172–73).)

NIIA was never funded by Insurety and had no relationship with Insurety. (Doc. 229, Ex. 11 (4/7/21 Beruff Dep. at 14); Doc. 273 at 94.) NIIA asked Pagnanelli to participate in a few communications with potential funding sources. (Doc. 271 at 103–104, 109.) In November

---

[6] The district court colloquially found that Jordan used NIIA to "step into AWIS's shoes" and "essentially replace AWIS." (Doc. 350 at 15.) This should not be construed as a finding that NIIA took over AWIS's business, which would be contrary to the undisputed evidence. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 176).) There was no evidence any premiums on policies marketed by AWIS were rerouted to NIIA.

2019, NIIA began a relationship with Advance Plus. (Doc. 229, Ex. 9 (5/20/21 Brock. Dep. at 67); Doc. 271 at 109; Doc. 271-1 at 62, 78.) Pagnanelli's involvement in the deal was limited to three to four hours (Doc. 271 at 110). He did not get paid for those few hours (while the actual broker for the deal did). (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 185); Doc. 271 at 110; Doc. 274 at 139.) Advance Plus funded NIIA's commission advances for the following years. (Doc. 271 at 111.) According to Gray at Insurety, NIIA's relationship with Advance Plus—which did not begin until approximately seven months after Pagnanelli was terminated—caused Insurety to lose "leverage" over Jordan and AWIS. (Doc. 273 at 97, 109–110.)

### I. Insurety sues Pagnanelli. The district court rejects some of Plaintiffs' theories before trial. Insurety settles with AWIS.

In January 2020, 777 and Insurety filed this action against Pagnanelli in the Southern District of Florida. (Doc. 1 at 1.) Plaintiffs alleged four claims that survived until trial: federal trade secret misappropriation under 18 U.S.C. § 1832; trade secret misappropriation under the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001–

688.009 (2026); breach of Pagnanelli's employment agreement; and breach of fiduciary duty. (Doc. 1 at 17–28.)

Plaintiffs alleged other claims that were eliminated along the road to judgment. Their claims for defamation and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, were dismissed without prejudice under Federal Rule of Civil Procedure 12(b)(6), then omitted from the second amended complaint. (Doc. 51 at 6–11; Doc. 70.) Plaintiffs alleged a claim for tortious interference with contract, on which the court granted summary judgment for Pagnanelli. (Doc. 232 at 21–22; Doc. 252 at 4.) And Plaintiffs' third amended complaint added a claim for fraudulent concealment, which the district court later dismissed under Rule 12(b)(6). (Doc. 146 at 28; Doc. 184 at 5, 12–24.)

The breach of employment agreement claim was pared down on summary judgment. The district court granted partial summary judgment for Pagnanelli on the claimed breach of the nonsolicitation provision. (Doc. 232 at 11; Doc. 252 at 4.) The court (properly) concluded NIIA was not an Insurety "client" during Pagnanelli's employment with Insurety, and Plaintiffs did not show any damages from Pagnanelli's unsuccessful effort to help find a funder for AWIS.

(Doc. 232 at 7–11; Doc. 252 at 4.) The court also found no evidence that Pagnanelli disparaged Plaintiffs and granted him partial summary judgment on their claimed breach of the nondisparagement provision. (Doc. 232 at 11–12; Doc. 252 at 4.)

The trade secrets claims were also pared down. The district court granted partial summary judgment for Pagnanelli on Plaintiffs' request for an award of lost profits for their trade secrets claims because Plaintiffs failed to provide a computation of damages as required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii). (Doc. 232 at 19–21; Doc. 252 at 4.)

On the eve of trial in this action, Insurety settled its Texas litigation with AWIS. (Doc. 273 at 101; Doc. 297-3 at 1.)

### J. The district court conducts a bench trial in this action and finds largely for Insurety.

The district court convened a three-day bench trial and heard live testimony from Pagnanelli, Wander, Beruff, Gray, and Hartelust, among others. (*See* Docs. 262, 271–74; *see* Doc. 146-1 at 12–13 ("waiver of jury trial" provision in employment agreement).) The court also

admitted a number of deposition transcripts into evidence. (Doc. 274 at 5; *see* Doc. 229 at 1–24 and Exs. 1–12.)

At the close of Plaintiffs' case, Pagnanelli moved for judgment on partial findings under Federal Rule of Civil Procedure 52(c) because Plaintiffs failed to prove damages. (Doc. 274 at 9–12.) The court reserved ruling until the close of evidence. (Doc. 274 at 23.)

About six months later, the district court largely adopted Plaintiffs' proposed findings of fact and conclusions of law and entered judgment for Plaintiffs. (Doc. 278; Doc. 295; Doc. 296.)

The court found Pagnanelli liable for breach of contractual loyalty duties (§§ 3, 6(A), 6(F)), the noncompetition provision (§ 6(D)), and confidentiality obligations (§§ 6(B), 6(C)). (Doc. 295 at 4–8, 11–19, 26–31.) The court found that Pagnanelli breached his contractual obligations by inducing Insurety to enter into a funding relationship with AWIS, and then after his termination, briefly attempting to assist AWIS and NIIA with finding funding. (Doc. 295 at 28–29.)

The court awarded contract damages of $8,088,934. (Doc. 295 at 20–21.) Central to the award was the finding that AWIS was not a

viable business, and that Pagnanelli knew there was no legitimate reason for Insurety to loan money to AWIS. (Doc. 295 at 20.)

The court calculated the damages award as follows:

| | |
|---|---|
| Amount Insurety loaned to AWIS | $36,902,303 |
| Amount Insurety paid to borrow the funds it loaned | 5,404,617 |
| Amount Insurety collected from AWIS | (30,915,093) |
| Amount AWIS paid Insurety to settle the Texas suit | (3,302,893) |
| **Damages awarded** | **$8,088,934** |

(Doc. 295 at 16, 20–21.) Thus, Insurety recouped over ninety-two percent of the money it lent, having lent $36.9 million and recouped $34.2 million.

The court also found Pagnanelli liable for misappropriation of trade secrets contained in a two-tab Excel spreadsheet that Pagnanelli's father helped to create for estimating the value of commission streams under different assumptions. (Doc. 273 at 19; Doc. 274 at 41–55; Doc. 280-12; Doc. 295 at 22–24, 33–39.) The court awarded an injunction against using the spreadsheet and $860,271.25 as disgorgement. (Doc. 295 at 38–40; Doc. 296.) The court also awarded reasonable attorneys' fees to be determined by separate motion. (Doc. 295 at 40; Doc. 296.)

Finally, the court found for Pagnanelli on the breach of fiduciary duty claim because it was displaced by the breach of contract claim. (Doc. 295 at 22, 32.)

### K. The district court partially grants Pagnanelli's postjudgment motion to amend. Both sides appeal.

Pagnanelli moved to amend the court's findings of fact and conclusions of law and judgment, or alternatively for a new trial, under Federal Rules of Civil Procedure 52(b), 59(a), and 59(e) (the "motion to amend the judgment"). (Doc. 297.)

While the motion to amend the judgment remained pending for over two and a half years,[7] Pagnanelli moved for leave to present supplemental briefing and testimony on a wave of fraud lawsuits against 777 and Wander—consistent with Pagnanelli's trial testimony that his relationship with Plaintiffs deteriorated because he raised the alarm that 777 and Wander were misdirecting funds and engaging in

[7] Initially, the court denied the motion as untimely, but reconsidered because it had erroneously calculated the filing deadline from the date the judgment was signed, rather than from the date the judgment was entered. (Doc. 297 at 1–2; Doc. 310 at 1–6; Doc. 313 at 1–2.)

improper financial dealings. (Doc. 314 at 1–6.) The court denied the motion. (Doc. 321.)

Later, 777's counsel moved for leave to withdraw from the action and to remove 777 from the case caption because 777 asserted it assigned its claims in this action to Insurety. (Doc. 338 at 1–2.) Plaintiffs asserted that 777 no longer has any interest in the lawsuit, and will not participate going forward. (Doc. 348 at 2.)

In September 2025, Insurety (a Delaware limited liability company) had its registration to do business in Florida revoked for failure to file its annual report. (Doc. 347 at 4; *see* Fla. Stat. § 605.0212(6) (2026) ("A . . . foreign limited liability company that fails to file an annual report that complies with the requirements of this section may not maintain or defend any action in a court of this state until the report is filed and all fees and penalties due under this chapter are paid . . . ."))

In October 2025, the federal government indicted Wander, and the SEC filed a civil complaint against Wander and 777 for financial fraud. (Doc. 325.) 777's CFO Alfalla, the person who confirmed Pagnanelli's suspicions about 777's improper financial dealings (Doc. 271 at 132–

133; Doc. 274 at 127–128), pleaded guilty for his role (Doc. 325; Doc. 346). The district court granted Pagnanelli's request for judicial notice of the indictments, complaint, and guilty plea. (Doc. 333.)

In March 2026, the district court partially granted Pagnanelli's post-trial motion and entered amended findings and an amended final judgment. (Doc. 349; Doc. 350; Doc. 351.) The court found that the evidence it had relied on to calculate the $860,271.25 disgorgement award for the trade secrets claims was not linked to Pagnanelli's misappropriation of trade secrets. (Doc. 349 at 6–7.) And the court found that including fraud findings was inconsistent with its prior order dismissing the fraud claim. (Doc. 349 at 8–9.) Thus, the court's amended findings and judgment reduced the disgorgement award to $0 and removed the fraud findings. (Doc. 350; Doc. 351.) However, the court did not alter its finding that Pagnanelli's breach of his employment contract caused Insurety and 777 $8,088,934 in damages. (Doc. 349 at 3–5; Doc. 350 at 20–21; Doc. 351.)

The court granted 777's counsel motion for leave to withdraw from the action, but denied Plaintiffs' request to remove 777 from the caption. (Doc. 352.)

Pagnanelli timely appealed and Insurety cross-appealed. (Doc. 353; Doc. 357.)

Insurety moved for attorneys' fees on the trade secrets claim for which it was awarded no monetary recovery. (Doc. 375.) The district court denied the motion without prejudice because "the appeal in this matter may impact the resolution . . . ." (Doc. 383 at 2.)

## SUMMARY OF THE ARGUMENT

The district court awarded Plaintiffs $8,088,934 in contract damages representing the amount of unpaid loans that AWIS owed Insurety. But AWIS repaid its loans without fail—for nearly a year—until Plaintiffs themselves made the independent decision to suddenly cut off AWIS's funding in a hardball negotiation tactic to premise continued funding upon an ownership interest in AWIS. That decision destroyed AWIS's ability to operate and that is what caused AWIS to stop repaying Plaintiffs. Pagnanelli had nothing to do with it; he had been terminated months earlier. Plaintiffs' own unilateral conduct is the intervening cause that breaks any chain of proximate causation between Pagnanelli's contractual breaches and the damages awarded.

The district court's contrary findings and conclusions are unsupportable. The district court linked Insurety's damages to Pagnanelli's breach of contractual loyalty obligations by finding that AWIS was not a viable business and that Pagnanelli knew Insurety was unlikely to be repaid when he introduced Insurety to AWIS. That finding is clearly erroneous. AWIS had operated for over two decades. It passed Plaintiffs' own rigorous due diligence process. It was acquired for millions of dollars—twice. After terminating Pagnanelli, Plaintiffs themselves sought to buy an ownership stake in AWIS because they thought "it could be a very profitable relationship." And while Insurety was funding AWIS, AWIS never missed a payment. A business that repays every dollar on time, passes extensive vetting, and attracts millions of dollars in acquisition value is not a nonviable business.

The district court's alternative theory—that Pagnanelli's post-termination involvement in AWIS's and later NIIA's efforts to secure funding caused AWIS to declare bankruptcy, rather than sell an equity stake to Insurety—fares no better. Pagnanelli's two phone calls and a few emails to take a shot at finding other funding for AWIS were unsuccessful. His later attempts to assist NIIA—limited to three or

four unpaid hours—related to a funding relationship that was not consummated until *after* AWIS filed for bankruptcy. The speculative theory that Pagnanelli's involvement reduced Insurety's negotiating "leverage," thereby slowing the equity negotiations and prompting Plaintiffs to pull funding, is far too attenuated (and confusing) a chain of causation to satisfy Florida's proximate cause standard. Indeed, had Pagnanelli's efforts to secure alternative funding for AWIS succeeded in overcoming Insurety's efforts to prevent it, AWIS would have continued operating and repaying Plaintiffs—eliminating the very damages the court awarded.

Because there is no substantial evidence that Pagnanelli's contractual breaches proximately caused Plaintiffs' damages, and because damages are an essential element of a breach of contract claim, this Court should reverse with instructions to enter judgment for Pagnanelli on the breach of contract claim. The court should also remand for the district court to reconsider its attorneys' fees award on the trade secrets claims because it was based on the same clearly erroneous finding of harm underlying the contract claim.

## STANDARD OF REVIEW

On review after a bench trial, this Court considers legal issues de novo, and reviews factual findings for clear error. *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 898 F.3d 1110, 1118 (11th Cir. 2018). For mixed questions of law and fact, the standard of review depends on whether answering them entails primarily legal (de novo) or factual (clear error) work. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1301 (11th Cir. 2020).

## ARGUMENT

### I. Under governing Florida law, a plaintiff suing for breach of contract must show the defendant was both the cause-in-fact and the proximate cause of its damages.

"Under Florida law, damages are an essential element of an action for breach of contract." *Farman v. Deutsche Bank Nat'l Tr. Co.*, 311 So.3d 191, 195 (Fla. 2nd DCA 2020) (citation omitted). To recover damages for breach of contract, a plaintiff must establish that the defendant's breach was a " 'substantial factor' " in causing its injuries. *Stensby v. Effjohn Oy Ab*, 806 So.2d 542, 544 (Fla. 3d DCA 2001). Damages for breach of an employment agreement "are intended to

make the prior employer whole, not to punish employees." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1243 (11th Cir. 2009).

Proving that damages were caused by the defendant's breach entails showing two components: cause in fact and proximate (or legal) causation. *Halliburton Co. v. E. Cement Corp.*, 672 So.2d 844, 846 (Fla. 4th DCA 1996); *see Tietig v. Se. Reg'l Constr. Corp.*, 557 So.2d 98, 99 (Fla. 3d DCA 1990).

*Cause in fact (but for cause).* Cause in fact is determined by the factfinder using the "but for" test: A contract plaintiff may recover damages only in an amount which will place him in the position he would have obtained "but for" the breach. *Burger King Corp. v. Mason*, 710 F.2d 1480, 1494 (11th Cir. 1983). "'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.'" *Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting *Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So.2d 1015, 1018 (Fla. 1984)); *see Proto v. Graham*, 788 So.2d 393, 396 (Fla. 5th DCA 2001) (reversing denial of directed verdict where legal

malpractice plaintiff failed to prove "that any alleged negligence 'probably rather than possibly' caused [the] alleged damages").

To recover damages resulting from a lost business opportunity, for example, the plaintiff must prove that the opportunity would have been consummated but for the breach. *Stensby*, 806 So.2d at 544. Or to recover damages for misappropriated cargo, the plaintiff must prove the damage would have been prevented had the defendant satisfied his contractual duties. *See Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.*, 172 F.3d 781, 784–85 (11th Cir. 1999).

*Proximate (or legal) causation.* A plaintiff must also prove proximate, or legal, causation of its claimed damages. Although proximate causation is generally a factual inquiry, courts may resolve it as a question of law when reasonable people cannot differ. *Dep't of Transp. v. Anglin*, 502 So.2d 896, 899 (Fla. 1987). There is also a legal aspect to the proximate cause inquiry: The law limits liability from a tenuous chain of but-for causes that might otherwise extend backwards indefinitely. *Halliburton*, 672 So.2d at 846; *see Barati v. Aero Indus., Inc.*, 579 So.2d 176, 178 (Fla. 5th DCA 1991) (describing determination of proximate cause by courts as "actually policy decisions").

Proximate causation requires that any damages must "flow[] as the natural and proximate result of defendant's wrongful conduct." *Aldon Indus., Inc. v. Don Myers & Assocs., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975). Consequently, "a key inquiry in a breach of contract suit is whether a plaintiff's asserted 'damages were reasonably foreseeable to [the defendant] at the time the contracts were made.'" *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1222 (11th Cir. 2018). Damages that are too "remote" from the defendant's breach are not recoverable. *Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc.*, 459 So.2d 335, 336 (Fla. 5th DCA 1984) (holding lost profits claim too remote where third party's intervening conduct caused damage).

A defendant's conduct that simply "provide[s] the occasion" for another party's "bizarre and reckless" actions does not proximately cause any ensuing damages. *Anglin*, 502 So.2d at 900 (holding that the negligent pooling of water on a highway that caused a first accident did not proximately cause injuries from a passerby's reckless efforts to help). The nondefendant's reckless conduct is an "independent,

intervening cause" that breaks the chain of proximate causation. *Id.* at 899.

Often times, a plaintiff's "own actions" "interrupt[] the chain of causation" and are deemed "an independent intervening cause" of the plaintiff's harm. *Aldon Indus.*, 517 F.2d at 192. For example, a carpet dealer's removal from a client's bidding list was not proximately caused by its supplier's defective carpet, but rather by the fact that the dealer knew of the defects before authorizing the carpet's installation. *Id.* And in a negligence action, a plaintiff's improvident choice to repair a defective product using a ladder rather than scaffolding was the intervening cause of his injuries. *Barati*, 579 So.2d at 178; *cf. Melton v. Estes*, 379 So.2d 961, 963 (Fla. 1st DCA 1979) (holding that after the defendant failed to advise the decedent of the location of a subterranean septic tank and plaintiff's trailer fell in, the decedent's improvident repair efforts were an independent, intervening cause of his death).

Accordingly, a plaintiff cannot show that the defendant's alleged misconduct proximately caused his injury where the plaintiff's own choices caused its injury. *See Tietig*, 557 So.2d at 99 (holding plaintiff could not establish causation where damages resulted from its agent's

"unilateral and purely voluntary decision" not to consummate a transaction); *Chipman v. Chonin*, 597 So.2d 363, 364 (Fla. 3d DCA 1992) (per curiam) (holding legal malpractice plaintiff's loss "attributable to . . . himself, since he chose to voluntarily accept his former employer's settlement offer").

Florida's causation doctrines are similar to federal causation doctrines. For instance, an admiralty plaintiff that is the superseding cause of its own injury may not recover damages from contracting partners—even though their breaches were causes in fact of the plaintiff's injury. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 840 (1996). And in a 42 U.S.C. § 1983 action, the "intervening free, independent, and volitional acts" of a nondefendant that cause harm "sever[] any connection" between the defendant's actions and the harm. *Coley-Pearson v. Martin*, 156 F.4th 1133, 1145 (11th Cir. 2025) (citations omitted).

## II. The district court erred in concluding that Pagnanelli's contractual breaches caused Plaintiffs' damages. Plaintiffs caused their own harm.

### A. Plaintiffs' unilateral decision to cut off AWIS's funding caused AWIS to stop repaying Plaintiffs.

The $8.1 million damages award was based on the amount and cost of money Plaintiffs lent to AWIS, less the amount that AWIS repaid. (Doc. 350 at 20.) The undisputed facts show that Plaintiffs' own independent conduct caused AWIS to stop repaying them—meaning they caused their own harm.

If a district court's factual findings omit a fact, but the omitted fact is clearly supported by undisputed evidence, the reviewing court should treat that fact as established for purposes of the appeal. The reviewing court should consider the additional uncontroverted facts because there is a "difference" between "contradicting a factfinding, on the one hand, and ignoring uncontroverted facts that the district court failed to mention on the other." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (reviewing a sentencing). "That difference is important because a district court cannot write out of the record undisputed facts by simply ignoring them." *Id.* This court should not credit any inference that is "at war with uncontradicted or

unimpeached facts." *Fenner v. Gen. Motors Corp.*, 657 F.2d 647, 651 (5th Cir. 1981) (per curiam) (citation omitted).

The district court found that AWIS "withheld Insurety's collections and refused to pay Insurety," but omitted the crucial finding on *when* that happened. (Doc. 350 at 15.) As we explain, the undisputed facts show that AWIS did not withhold any collections until *after* Plaintiffs made the independent decision to cut off AWIS's funding, undermining AWIS's ability to continue operating (and paying back Insurety's loans).

It is undisputed that Pagnanelli had no role in Plaintiffs' decision to cut off AWIS's funding in July 2019. His employment at Insurety had been terminated months before, in April 2019, and Insurety was operating under a new CEO. (Doc. 273 at 70; Doc. 350 at 11.) Plaintiffs' officials testified that their decision to cut off AWIS was a hardball negotiation tactic to force through their demand for a partial acquisition of AWIS, and that they would have resumed funding had the transaction completed. (*See* Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 76); Doc. 273 at 57–58, 64–65.) Internally, Plaintiffs reported that they ceased funding AWIS because they lacked the funds. (Doc. 274 at 99–

100; *see* Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 213 (Plaintiffs also stopped advancing other companies)).) Either way, Plaintiffs' decision to cut off funding did not involve Pagnanelli.

It is also undisputed that, until Plaintiffs cut off AWIS's funding in July 2019, AWIS was invariably timely in repaying their loans. (Doc. 272 at 87; Doc. 273 at 105, 107; Doc. 274 at 98–99.) Even in early 2019, when *Insurety* did not timely provide some of the funding it had committed, AWIS remained timely in its repayments. (Doc. 272 at 87; Doc. 273 at 105, 107; Doc. 274 at 98–99.) It is undisputed that AWIS missed or delayed payments only *after* Plaintiffs cut off AWIS's funding entirely, which was months after Pagnanelli left Insurety's employ. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 159–160); Doc. 272 at 88; Doc. 273 at 59, 107.) And it is undisputed that AWIS could not operate without Insurety's loans, which explains why AWIS had to withhold the payments. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 130, 159, 213–14); Doc. 229, Ex. 9 (5/20/21 Brock Dep. at 220); Doc. 274 at 100.)

Thus, it is Plaintiffs' "own actions," not Pagnanelli's, that were the proximate cause of their injuries. *Aldon Indus.*, 517 F.2d at 192.

### B. Plaintiffs' damages were not caused by any breach of Pagnanelli's contractual loyalty obligations.

#### 1. The district court's contrary conclusion rests on the finding that AWIS was not a viable business.

Pagnanelli's contractual loyalty duties (§§ 3, 6(A), 6(F)) terminated in April 2019, when Plaintiffs terminated his employment. (Doc. 146-1 at 8 (conflict of interest provision applies "[w]hile employed by the Company"); *see Sanz v. R.T. Aerospace Corp.*, 650 So.2d 1057, 1059 (Fla. 3d DCA 1995) (holding restrictive covenants in employment agreements do not survive the termination of employment in the absence of an express provision). The district court found that Pagnanelli breached his contractual loyalty duties because, while employed by Plaintiffs, Pagnanelli led Insurety into a funding relationship with AWIS while concealing his interest in AWIS, and Plaintiffs would not have entered into that relationship absent Pagnanelli's inducement. (Doc. 350 at 13, 20, 28.)

Even if these findings could justify why the loyalty breaches were a *but for* cause of Plaintiffs' damages, they do not establish that the breaches *proximately* caused Plaintiffs' damages. *See Aldon Indus.,* 517 F.2d at 191–92 (holding that damages must flow as the "natural and

proximate result of defendant's wrongful conduct," rather than from the plaintiff's "own actions").

The essential link in any *proximate* connection between breaches of contractual loyalty obligations and the $8.1 million damages award is the finding that AWIS was never a viable business. (Doc. 350 at 20.) The court found that Plaintiffs' loss was "foreseeable" because Pagnanelli (1) "knew that there was no legitimate business purpose" for the loans to AWIS; (2) "knew that AWIS was not a viable business and could not survive on its own"; and (3) "knew that Insurety was unlikely to be repaid." (Doc. 350 at 20; *see Sun Life Assurance Co.*, 904 F.3d at 1222 (describing foreseeability of damages as "a key inquiry" required for proximate cause).)

**2. The district court clearly erred in finding that AWIS was not a viable business.**

A factual finding is clearly erroneous "'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (citation omitted). The reviewing court's deference to the district

court is "not unlimited," and it "will hold a finding of fact clearly erroneous if the record lacks substantial evidence to support it." *United States v. Robertson*, 493 F.3d 1322, 1335 (11th Cir. 2007) (citation omitted) (holding a causation finding clearly erroneous); *see Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928, 939 (11th Cir. 1983) (holding that the reviewing court also "must consider the evidence as a whole and set it aside if [it is] 'left with the impression it is not the truth and right of the case.'").

Here, the court clearly erred in finding that there was no legitimate purpose for loaning funds to AWIS; that AWIS was not a viable business; and that Insurety was unlikely to be repaid. (*See* Doc. 350 at 20.) No substantial evidence supports these findings.

*There was a legitimate business purpose for the loans to AWIS.* Insurety's entire business was to loan money to independent marketing organizations, who then provided insurance agents with advances on their commissions for selling policies; when policyholders later paid their premiums, those funds were used to repay Insurety's loans and fees. (Doc. 227 at 3; Doc. 274 at 25; Doc. 350 at 2–3.) Insurety sought to make a profit by charging hefty fees for the funds it loaned, which

can also be viewed as interest. (Doc. 273 at 103; Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 83); Doc. 350 at 2–3.) AWIS was an independent marketing organization. (Doc. 271 at 131; Doc. 274 at 95.) Thus, AWIS was exactly the type of business Insurety was in business to fund.

The funding deal between Insurety and AWIS was scrutinized through Plaintiffs' robust ten-step deal approval process and approved by Plaintiffs' executives other than Pagnanelli. (Doc. 272 at 71–72; Doc. 273 at 45–46, 52; Doc. 280-6 at 12; Doc. 288-4 at 3–4.) AWIS satisfied the vetting process without generating any significant concerns. (*See* Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 38, 43).)

Some witnesses noted that Insurety advanced AWIS funding for eight months' worth of commissions, whereas the majority of Insurety clients received funding for six months. (Doc. 273 at 53; Doc. 274 at 92, 122–23.) If anything, the additional length reflects Insurety's comfort level with AWIS and bolsters the case that AWIS was a going concern. That feature of their deal—well known, considered, and approved by Plaintiffs (*see* Doc. 291 at 2)—certainly does not negate AWIS's legitimacy.

Insurety sometimes advanced funds to other clients for even longer periods, including up to nine months for Agentra. (Doc. 273 at 41, 53, 56; Doc. 274 at 92, 122–23.) And Insurety charged AWIS a higher fee than other clients to compensate Insurety for the above-average funding length. (Doc. 274 at 93.) If Plaintiffs ever believed the length of the funding period was a problem, Insurety maintained full discretion to reduce the period (Doc. 273 at 56; Doc. 291 at 2), but it never did so even though AWIS's funding requests were monitored with "extreme scrutiny" and approved weekly by 777's CFO (Doc. 274 at 94–95, 123).

*AWIS was a viable business.* AWIS had been operating for over two decades before Insurety started funding it. (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 51).) Insurety's vetting process included on-site visits with AWIS's management team and an analysis of the products it sold. (Doc. 273 at 45.) AWIS was acquired for millions of dollars before Insurety started funding it, and then acquired again for millions of dollars the next year. (Doc. 227 at 4; Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 66–67, 73–74); Doc. 271-1 at 151.) After terminating Pagnanelli, Plaintiffs themselves demanded an ownership stake in

AWIS—and were willing to pay for it—because they thought "it could be a very profitable relationship." (Doc. 229, Ex. 12 (5/27/21 Gray Dep. at 74–77); *see* Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 156).)

While Insurety was funding AWIS, AWIS was timely repaying its loans. *See* Part II.A. The court found that AWIS "could not survive on its own" (Doc. 350 at 20), which is true as far as it goes—like many independent marketing organizations, AWIS depended on funding. But as long as Insurety continued lending, AWIS continued repaying. This symbiotic relationship provides no support for the broader finding that AWIS was "not a viable business." (Doc. 350 at 20.) Many businesses cannot survive without loans or other funding—that's why they get it! The fact that a business fails when ongoing funding suddenly stops is not substantial evidence that the business was nonviable when the initial funding was provided.

*Insurety was likely to be repaid.* Even after Insurety terminated Pagnanelli's employment, Plaintiffs continued loaning money to AWIS, and AWIS continued making the required repayments. (Doc. 272 at 87; Doc. 273 at 104–05, 107; Doc. 274 at 98.) In total, Insurety transferred about $36.9 million to AWIS's bank accounts. (Doc. 273 at 99–100; Doc.

350 at 20.) AWIS repaid Insurety about $30.9 million (about $14 million prebankruptcy and $17 million postbankruptcy), plus a settlement of $3.3 million. (Doc. 273 at 101, 107; Doc. 350 at 20.)

As discussed above, AWIS was a viable business and current on its payments until Insurety suddenly pulled the rug from under AWIS and destroyed its ability to operate. But even with the disruption in operations and even with the bankruptcy, AWIS ultimately repaid over ninety-two percent of the money it received from Plaintiffs ($34.2 million of $36.9 million). There is simply no substantial evidence to suggest ex ante that AWIS was unlikely to repay its debts—the history refutes the district court's finding.[8]

[8] The district court cites snippets from Pagnanelli's undated text messages to ambiguously find he "knew what he was doing." (Doc. 350 at 14.) The text snippets are incoherent and do not help to explain whether Pagnanelli knew AWIS was unlikely to repay its debts. (Doc. 350 at 14.) The messages become somewhat more coherent—but remain irrelevant—in light of Pagnanelli's uncontroverted testimony explaining that they were a joking way to rile up a close friend. (Doc. 271 at 61, 134.)

### C. Plaintiffs' damages were not caused by any breach of the contractual noncompetition or confidentiality provisions.

#### 1. The district court's contrary conclusion rests on the finding that Pagnanelli caused AWIS to file for bankruptcy instead of selling a stake to Insurety.

The district court's findings do not explicitly link the breaches of the *noncompetition* provision (§ 6(D)) and *confidentiality* provisions (§§ 6(B), 6(C)) to the $8.1 million damages award. (*See* Doc. 350 at 17–20.) The court found only that "Defendant has continued to receive illicit payments from NIIA" "[a]s a result" of breaching those provisions. (Doc. 350 at 18–19.) The court correctly denied Plaintiffs' request for disgorgement of those amounts (Doc. 350 at 17, 21, 29) because "under Florida law, disgorgement of profits earned is not a remedy for breach of contract." *Proudfoot Consulting*, 576 F.3d at 1245.

In partially denying Pagnanelli's motion to amend the judgment, however, the court relied on Pagnanelli's purported "efforts to sabotage Insurety's collection efforts with AWIS"—i.e., Pagnanelli's involvement in efforts to secure other funding sources for AWIS and later NIIA—which purportedly caused AWIS to declare bankruptcy rather than

complete the sale of an ownership stake to Insurety. (Doc. 349 at 4–5 (citation omitted).)

**2. Pagnanelli's involvement in AWIS and NIIA's efforts to secure funding was not a cause in fact of AWIS's bankruptcy.**

For employment-noncompetition restrictive covenants, damages from breach are not the "normal remedy" because it is "inherently difficult" to "determin[e] just what damage actually is caused by the employee's breach of the agreement." *Miller Mech., Inc. v. Ruth*, 300 So.2d 11, 12 (Fla. 1974). The same is true for employment-confidentiality restrictive covenants. *Proudfoot Consulting*, 576 F.3d at 1243.

Here, the evidence fell far short of satisfying the inherently difficult task of showing damages caused by these types of breach.

*Funding for AWIS.* It is undisputed that, after Pagnanelli's employment was terminated, he participated in a few brief communications to explore possible funding sources for AWIS. In May 2019, he participated in a short call with his former boss at Producer Advance. (Doc. 272 at 14–15, 24.) In late July 2019, he exchanged emails and participated in a call with someone he had never met at

Financial Carrier Services. (Doc. 272 at 32–35, 47.) It is undisputed that those efforts were not successful, and that AWIS did not secure other funding. (Doc. 272 at 27, 67.)

There is no substantial evidence that Pagnanelli's modest attempts to explore other funding for AWIS—successfully stymied by Insurety, *see* Doc. 80-1 at 4; Doc. 272 at 17, 27, 60–61, 67—were a but-for cause of AWIS's bankruptcy. Plaintiffs' theory seems to be that Pagnanelli's two unsuccessful phone calls and an email exchange emboldened AWIS to resist Plaintiffs' demand for equity; absent that, AWIS would have capitulated, which would have caused Plaintiffs to resume funding, which would have avoided AWIS's bankruptcy. (*See* Doc. 349 at 4–5.) But this theory ignores that AWIS had every reason to explore other funding *with or without Pagnanelli's help*—Insurety was demanding equity to continue funding and AWIS could not survive without that funding. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 156, 213–14); Doc. 229, Ex. 9 (5/20/21 Brock Dep. at 220).) AWIS's ownership and management were longtime industry veterans (Doc. 220-7 at 34 (4/15/21 Terlizzi Dep. at 33); Doc. 271-1 at 69, 75; Doc. 272 at 33), and there is no evidence they needed Pagnanelli (a comparative

novice) to help them understand the company's perilous position (*see* Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 130)). It is simply too speculative to conclude AWIS would have avoided bankruptcy if only Pagnanelli had withheld his brief and ineffective assistance in an inquiry AWIS could and would have explored without him. *See Guinn*, 602 F.3d at 1256 (holding speculation insufficient to prove causation).

*Funding for NIIA*. It is also undisputed that, well after Pagnanelli's employment was terminated and while he was unemployed, NIIA asked Pagnanelli to participate in a few communications with potential funding sources NIIA already was communicating with. (Doc. 271 at 102–104.) Jordan acquired NIIA around fall of 2019. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 18–19, 142, 173).) NIIA began a relationship with Advance Plus in November 2019, *after* AWIS filed for bankruptcy in October 2019. (Doc. 55-8 at 4; Doc. 271 at 109; Doc. 271-1 at 62, 78.) Pagnanelli's involvement in NIIA's communications with Advance Plus was unpaid and limited to three to four hours total, in contrast to the deal broker, who was paid. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 185); Doc. 271 at 110; Doc. 274 at 139.)

There is no substantial evidence that Pagnanelli's limited and inessential communications assisting Jordan in his efforts to obtain funding for NIIA were a but-for cause of AWIS's bankruptcy. For starters, NIIA's funding relationship with Advance Plus did not begin until *after* AWIS filed for bankruptcy; there was no substantial evidence that AWIS's decision to withhold payments and file for bankruptcy—forced by Insurety's withdrawal of funding—was caused by NIIA *later* securing funding. And there was no evidence that Jordan, who had been in the industry for decades, would not or could not have sought a funding source for NIIA absent Pagnanelli's limited involvement, especially because Pagnanelli did not even introduce NIIA to the funding source it secured.

According to Gray, NIIA's relationship with Advance Plus caused Insurety not to have the same "leverage" over Jordan. (Doc. 273 at 97, 109–10.) Plaintiffs' convoluted, five-step theory appears to be that, if Pagnanelli had not worked to explore funding for AWIS (unsuccessfully) and then later for NIIA, then (1) AWIS and NIIA would not have comparably sought or found funding; (2) AWIS would have been in a weaker negotiating position; (3) AWIS would have recognized that its

only option to continue operating was to complete the sale of an equity stake to Insurety; (4) AWIS and Plaintiffs would have negotiated the details of the sale more quickly; and (5) Plaintiffs would not have pulled the funding during negotiations and driven AWIS into bankruptcy anyway if the negotiations were not proceeding as smoothly as expected. (*See* Doc. 273 at 97, 109–10.)

This tenuous chain of reasoning is not substantial evidence of factual causation. *See Resolution Tr. Corp. v. Stroock & Stroock & Lavan*, 853 F.Supp. 1422, 1429 (S.D. Fla. 1994) ("Whether the individual 'but for' assumptions could be accepted by a reasonable person is one question. Whether the entire scenario could be accepted by a reasonable person as being reasonably certain is another question."). It is sheer speculation whether Pagnanelli's involvement in NIIA's attempts to secure funding decreased Insurety's "leverage" over AWIS any more than someone else pursuing the same project, and it is yet more speculation to link any hypothetical decrease in Insurety's "leverage" to AWIS's not accepting Insurety's demands fast enough, or to Insurety's own fatal decision to suddenly withdraw funding. *See Stensby*, 806 So.2d at 544 (holding plaintiff alleging harm from failed

transaction must prove it would have been consummated absent the breach); *see also Proto*, 788 So.2d at 396 (holding no liability unless the defendant "probably rather than possibly" caused the alleged damages).

#### 3. Any link between Pagnanelli's breach and AWIS's bankruptcy is too remote to satisfy the proximate causation standard.

Even if Pagnanelli's involvement in efforts to secure funding for AWIS and later NIIA could be considered causes in fact of AWIS's bankruptcy (though they are not), there is no substantial evidence they *proximately* caused AWIS's bankruptcy—for four reasons.

*First*, Plaintiffs' own independent decision to suddenly withdraw funding is what drove AWIS into bankruptcy and caused AWIS to stop repaying Insurety. *See supra* Part II.A. Plaintiffs' decision was an intervening cause that broke any chain—if there was one—of proximate causation between Pagnanelli's involvement in the funding effort and Plaintiffs' damages. *See Aldon Indus.*, 517 F.2d at 192 (holding that in a contract action against the supplier of a defective carpet, the plaintiff's decision to knowingly install the defective carpet was an independent intervening cause of the plaintiff's damages from losing a client); *Barati*, 579 So.2d at 178 (holding that a plaintiff's dangerous

choice in how to repair a defect was the intervening cause of his personal injuries).

*Second*, the chain of reasoning required to link Pagnanelli's brief involvement in the funding effort to AWIS's bankruptcy is too long and remote to satisfy Plaintiffs' burden to prove proximate causation. Florida law rejects these types of "for-want-of-a-nail" arguments; were it otherwise, the manufacturer of a horseshoe's defective nail might be liable for a lost battle or a lost kingdom.[9] *Halliburton*, 672 So.2d at 845, 847; *see Funny Cide Ventures, LLC v. Mia. Herald Publ'g Co.*, 955 So.2d 1241, 1246 (Fla. 4th DCA 2007) (per curiam).

*Third*, Plaintiffs' proximate causation theory blows past a key timing issue: NIIA did not receive funding until *after* AWIS was in bankruptcy. (Doc. 55-8 at 4; Doc. 271 at 78, 109; Doc. 271-1 at 62.) Involvement in funding efforts for Jordan's *new company* that bore no

---

[9] Poor Richard's Almanac (1758) contains the proverb: "'For want of a nail the shoe was lost; For want of a shoe the horse was lost; And for want of a horse the rider was lost; For the want of a rider the battle was lost; For the want of a battle the kingdom was lost; And all for the want of a horseshoe-nail.'" *Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F.Supp.2d 1319, 1344, n.39 (S.D. Fla. 2006).

fruit until *after AWIS's bankruptcy* could not have been a substantial factor in causing *AWIS's bankruptcy*.

And *fourth*, the awarded damages did not "flow[] as the natural and proximate result" of Pagnanelli's breaches. *Aldon Indus.*, 517 F.2d at 191. It is undisputed that AWIS needed funding to survive. (Doc. 229, Ex. 8 (5/21/21 Jordan Dep. at 130); Doc. 274 at 100.) It is undisputed that the conduct adjudicated to breach the noncompetition and confidentiality provisions was aimed at securing that funding. (*See* Doc. 350 at 15.) If those efforts had *succeeded*, it is likely AWIS would have avoided bankruptcy and Plaintiffs would have been fully repaid. Thus, the "natural" and intended result of Pagnanelli's breaches would have been to *eliminate* the very damages awarded here, but Pagnanelli's efforts were thwarted by Plaintiffs' own actions. (*See* Doc. 55-3 at 2–3; Doc. 55-4 at 1; Doc. 273 at 91 (Insurety's securing a court order prohibiting AWIS from obtaining alternative funding).)

## III. This Court should direct entry of judgment for Pagnanelli on the contract claim and remand for reconsideration of entitlement to attorneys' fees on the trade secrets claims.

### A. This Court should reverse the damages award and direct entry of judgment for Pagnanelli on the contract claim.

As explained above, the district court's conclusion that Pagnanelli's contractual breaches damaged Plaintiffs rests on clearly erroneous factual findings and speculative theories of causation that are legally untenable.

Because damages are an "essential element" of a breach of contract action, *Farman*, 311 So.3d at 195, and there was no substantial evidence to support a finding that Pagnanelli caused Plaintiffs' damages, this Court should reverse the damages award and remand with directions to enter judgment for Pagnanelli on the contract claim. *See Proudfoot Consulting*, 576 F.3d at 1245 (rejecting plaintiff's request to remand to pursue an alternative damages methodology upon reversal of an unsupported damages award).

### B. This Court should vacate the finding of entitlement to fees on the trade secrets claims and remand for reconsideration.

The district court concluded that Plaintiffs are entitled to attorneys' fees for their trade secrets claims under 18 U.S.C. § 1836(b)(3)(D) and section 688.005, Florida Statutes. (Doc. 350 at 38; Doc. 380.) The district court has not yet set an amount for the fees, choosing to defer the issue until after this appeal because the appeal "may impact the resolution." (Doc. 383 at 2.)

Because the amount of the fees award is not yet determined, the order granting fees is not final and this court "do[es] not have jurisdiction" over the appeal "to the extent it challenges the award of attorneys' fees." *MetLife Life & Annuity Co. of Conn. v. Akpele*, 886 F.3d 998, 1008 (11th Cir. 2018). However, this court may review a nonappealable aspect of a district court order when that order is otherwise properly before the court. *Andrews v. Emps.' Ret. Plan of First Ala. Bancshares, Inc.*, 938 F.2d 1245, 1247 (11th Cir. 1991) (reversing fee award where amount had not yet been determined).

This Court should exercise its pendent appellate jurisdiction for the limited purpose of directing the district court to reconsider its order

awarding fees on the trade secrets claims in light of the requested reversal of the damages award on the contract claim. This Court need not and should not consider the merits of Plaintiffs' entitlement to fees in the absence of traditional finality and appellate jurisdiction. We cite the merits standard below only to emphasize the need for vacatur—the district court's award was grounded in the very contract damages issue on appeal here.

Attorneys' fees "may" be awarded only if the trade secret was misappropriated "willfully and maliciously." 18 U.S.C. § 1836(b)(3)(D); Fla. Stat. § 688.005. This is a high standard to meet. *See XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F.Supp.3d 1245, 1254 (S.D. Fla. 2016). And even if the standard is met, the court retains discretion to determine the prevailing party or deny fees to the prevailing party. *Real-Time Lab'ys, Inc. v. Predator Sys., Inc.*, 757 So.2d 634, 638 (Fla. 4th DCA 2000).

Here, the district court concluded the standard was met if a defendant uses a trade secret "'intending or recklessly disregarding that it will *cause economic harm* to the trade secret owner.'" (Doc. 349 at 8 (emphasis added).) The district court held Pagnanelli liable for fees

because it found he "used the trade secrets to help NIIA solicit and secure a new advance partner, steering business away from Insurety, *which caused economic harm*." (Doc. 349 at 8 (emphasis added).)

As explained above in Part II, there is no substantial evidence that anything Pagnanelli did caused Plaintiffs' self-inflicted harm. Accordingly, the district court's sole basis for the attorneys' fees is clearly erroneous. At minimum, the elimination of $8.1 million in contract damages would likely influence how the district court exercises its discretion whether to award fees on the trade secrets claims, especially because the district court has found no damages on the trade secrets claims and eliminated Plaintiffs' disgorgement award. (Doc. 349 at 6–7.)

## CONCLUSION

For the reasons explained above, this Court should reverse the damages award and direct entry of judgment for Pagnanelli on the contract claim. This court should also remand for the district court to reconsider its finding that Plaintiffs are entitled to attorneys' fees on the trade secrets claims.

September 21, 2026

**HORVITZ & LEVY LLP**
PEDER K. BATALDEN
ERIC S. BOORSTIN
**BERGER SINGERMAN LLP**
LEONARD K. SAMUELS

By: ______________________
Eric S. Boorstin

Attorneys for Defendant and Appellant
**CHRISTOPHER J. PAGNANELLI**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

*Check the appropriate box in section 1, and check the box in section 2.*

**1. Type-Volume**

☑ This document complies with the word limit of FRAP 32(a)(7)(B) because, excluding the parts of the document exempted by FRAP 32(f) and , this document contains 12,315 words.

**or**

☐ This brief complies with the line limit of FRAP because, excluding the parts of the brief exempted by FRAP 32(f) and , this brief uses a monospaced typeface and contains lines of text.

**2. Typeface and Type-Style**

☑ This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

(s) Eric S. Boorstin

Attorney for Defendant and Appellant Christopher J. Pagnanelli

Dated: September 21, 2026